1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   CLEAR CONNECTION                      No.  2:12-cv-02910-TLN-DB
     CORPORATION, a California
12   Corporation,

13                  Plaintiff,             **ORDER**

14          v.

15   COMCAST CABLE
     COMMUNICATIONS MANAGEMENT,
16   LLC, a Delaware limited liability company
     and DOES 1 through 30 inclusive
17
                    Defendant.
18

19

20          This matter is before the Court on Defendant Comcast Cable Communications

21   Management, LLC's ("Defendant") Motion for Summary Judgment.  (ECF No. 97.)  Plaintiff

22   Clear Connection Corporation ("Plaintiff") opposes the motion.  (ECF No. 123.)  For the reasons

23   set forth below, Defendant's motion (ECF No. 97) is GRANTED.

24   ///

25   ///

26   ///

27   ///

28   ///

                                            1

1

## I.    FACTUAL AND PROCEDURAL BACKGROUND

2      Plaintiff is a low-voltage wiring contractor.  (ECF No. 123-1 at ¶ 1.)  Plaintiff previously

3   provided residential cable installation services to Defendant.  (*Id.* at ¶¶ 1–2.)  Defendant provides

4   cable, internet, and phone services to residential and commercial customers.  (*Id.* at ¶ 23.)  As a

5   cable, internet, and phone service provider, Defendant competes with other multisystem operators

6   such as Charter, DirecTV, and AT&T.  (*Id.*)  Plaintiff was not Defendant's only cable installation

7   provider — Defendant also obtained cable installation services from other contractors and

8   Defendant's own in-house technicians.  (*Id.* at ¶¶ 24, 26.)  Plaintiff provided cable installation

9   services to Defendant pursuant to a written Preferred Vendor Agreement ("PVA"), which the

10   parties entered into on May 1, 2010, and was set to expire on December 31, 2012.  (*Id.* at ¶¶ 29,

11   30.)  From 2009 to 2011, Defendant also entered into PVAs with other cable installation

12   contractors in California.  (*Id.* at ¶¶ 30, 34.)  By their terms, the PVAs are nonexclusive and can

13   be terminated by either party with or without reason upon thirty days' notice.  (*Id.* at ¶¶ 32, 36.)

14      Before October 2009, Defendant often used multiple installation contractors in each

15   service area and these contractors often worked for Defendant in multiple service areas.  (*Id.* at ¶¶

16   40, 41.)  In October 2009, Defendant introduced a realignment plan reducing the number of

17   contractors it used from thirteen to nine.  (*Id.* at ¶ 42.)  Additionally, the realignment plan

18   assigned a contractor to be the preferred vendor in each service area.  (*Id.* at ¶ 43.)  Defendant

19   designated Plaintiff as the preferred vendor for the South Valley and the Central Valley.  (*Id.* at ¶

20   44.)  After the realignment, installation contractors could still contract with any other buyer of

21   low-voltage installation services, both within and outside the contractors' assigned service areas.

22   (*Id.* at ¶ 60.)  As part of the realignment plan, Defendant asked for and implemented a price cut in

23   the amount paid to the contractors for cable installation services.  (ECF No. 124 at ¶ 23; ECF No.

24   125-1 at 43.)

25      Defendant believed the realignment plan would improve quality and reduce costs for itself

26   and the contractors.  (ECF No. 123-1 at ¶¶ 55, 56.)  During the realignment, Defendant expected

27   the contractors to minimize disruption of customer service.  (*Id.* at ¶ 61.)  In addition, each

28   contractor was responsible for ensuring it had sufficient resources to maintain necessary service

levels in each service area.  (*Id.* at ¶ 63.)  Defendant anticipated that, after the parties adopted the realignment plan, the contractors might need to hire more technicians and obtain new facilities in some service areas, while making reductions in others.  (*Id.* at ¶ 64.)  Therefore, Defendant suggested the contractors communicate with each other to address resource needs.  (*Id.* at ¶ 62.)  Some contractors invited other contractors to meet with their employees to discuss job opportunities.  (ECF No. 123-1 at ¶ 65.)  However, the employees were not required to apply for employment with another contractor, and each contractor had the discretion to make its own hiring decisions.[1]  (*Id.* at ¶¶ 66–67.)

In the months after realignment, Defendant's performance metrics indicated significant problems with Plaintiff's performance.  (*Id.* at ¶¶ 73, 76.)  Defendant informed Plaintiff it was concerned with Plaintiff's low performance metrics and met to discuss these concerns and potential consequences.  (*Id.* at ¶¶ 74, 75.)  Later, Defendant decided Plaintiff would no longer perform installations for Defendant in the Central Valley.  (*Id.* at ¶ 79.)  On July 28, 2010, Defendant informed Plaintiff of its decision.  (*Id.* at ¶ 78.)  Thereafter, Defendant decided to terminate its PVA with Plaintiff.  (*Id.* at ¶ 86.)  On January 31, 2011, Defendant sent Plaintiff a notice of termination of the PVA pursuant to the terms of the contract.  (*Id.* at ¶ 85.)

On August 6, 2012, Plaintiff filed a Complaint in the California Superior Court for the County of Sacramento, asserting several trade restriction violations related to Defendant's realignment plan.  (ECF No. 1-1.)  On November 30, 2012, Defendant removed the action to this Court on the basis of diversity jurisdiction.  (ECF No. 1.)  On August 1, 2013, Defendant filed a Motion for Judgment on the Pleadings requesting dismissal of all claims.  (ECF Nos. 30, 31.)  On December 4, 2013, the Court granted the motion and dismissed Plaintiff's Complaint with leave to amend.  (ECF No. 39 at 11.)

On December 24, 2013, Plaintiff filed its First Amended Complaint ("FAC").  (ECF No. 42.)  Thereafter, on May 23, 2014, Defendant filed a new motion for judgment on the pleadings

---

[1]      Plaintiff contends the "economic realities" resulting from the realignment dictated that contractors hire from competing firms, but it agrees that "technically" hiring decisions were up to the contractors.  (*Id.*)

1   requesting dismissal of all claims.  (ECF No. 54.)  On December 8, 2015, the Court granted the

2   motion in part and denied it in part.  (ECF No. 65.)  Specifically, the Court dismissed the fourth

3   through seventh claims and denied the motion as to Plaintiff's first three claims.  (*Id.* at 23.)  The

4   Court granted leave to amend.  (*Id.* at 23.)  However, Plaintiff did not timely file a second

5   amended complaint, leaving the FAC as the operative complaint in this action.

6         On January 12, 2017, Defendant moved for summary judgment on Plaintiff's remaining

7   claims: (1) violation of the Cartwright Act; (2) civil conspiracy; and (3) violation of Cal. Bus. &

8   Prof. Code § 17200.[2]  (ECF No. 97 at 2.)

9         **II.    STANDARD OF LAW**

10        Summary judgment is appropriate when the moving party demonstrates no genuine issue

11  as to any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed.

12  R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under summary

13  judgment practice, the moving party always bears the initial responsibility of informing the

14  district court of the basis of its motion, and identifying those portions of "the pleadings,

15  depositions, answers to interrogatories, and admissions on file together with affidavits, if any,"

16  which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v.*

17  *Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof

18  at trial on a dispositive issue, a summary judgment motion may properly be made in reliance

19  solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at

20  324 (internal quotations omitted).  Indeed, summary judgment should be entered against a party

21  who does not make a showing sufficient to establish the existence of an element essential to that

22  party's case, and on which that party will bear the burden of proof at trial.

23        If the moving party meets its initial responsibility, the burden then shifts to the opposing

24  party to establish that a genuine issue as to any material fact actually does exist.  *Matsushita Elec.*

25  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities*

26  *Serv. Co.*, 391 U.S. 253, 288–89 (1968).  In attempting to establish the existence of this factual

27

28  [2]    Defendant filed a second motion for summary judgment as to counterclaims raised in its
    answer (ECF No. 103), which the Court will address by separate order.

dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *First Nat'l Bank*, 391 U.S. at 288–89.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits.  Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).  Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id.* at 587.

///

///

5

1    **III.    ANALYSIS**

2         A.    Cartwright Act Claim

3         In its first claim, Plaintiff challenges Defendant's realignment plan as an illegal restraint

4    of trade under the Cartwright Act.  Defendant, applying the rule of reason, argues summary

5    judgment should be granted on Plaintiff's Cartwright Act claim for five independent reasons: (1)

6    Defendant unilaterally adopted the realignment plan; (2) Defendant did not impose an

7    anticompetitive restraint; (3) Defendant did not have market power in the relevant market; (4) the

8    realignment plan did not result in any foreclosure to competition; and (5) the realignment plan

9    had procompetitive effects.  (ECF No. 98 at 12–13.)

10        In response, Plaintiff does not argue that material questions of fact preclude summary

11   judgment under the rule of reason.  Instead, Plaintiff contends summary judgment should not be

12   granted because Defendant's alleged conduct must be analyzed as a *per se* antitrust violation

13   rather than under the rule of reason.  (ECF No. 123 at 2–3.)

14              i.    *The Rule of Reason is the Law of the Case*

15        The parties disagree about whether the Court must abide by its previous finding that the

16   rule of reason applies to Plaintiff's antitrust allegations.  (*See* ECF No. 123 at 9; ECF No. 140 at

17   6.)  "The law of the case doctrine generally precludes reconsideration of 'an issue that has already

18   been decided by the same court, or a higher court in the identical case.'"  *Rocky Mt. Farmers*

19   *Union v. Corey*, 913 F.3d 940, 951 (9th Cir. 2019) (quoting *United States v. Alexander*, 106 F.3d

20   874, 876 (9th Cir. 1997)).  The law of the case may be disturbed if: "(1) the decision is clearly

21   erroneous and its enforcement would work a manifest injustice, (2) intervening controlling

22   authority makes reconsideration appropriate, or (3) substantially different evidence was adduced

23   at a subsequent trial."  *Earl Old Pers. v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002) (quoting

24   *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997)).

25        The Cartwright Act is California's principal antitrust law.  *In re Cipro Cases I & II*, 61

26   Cal. 4th 116, 136 (2015).  Under the Cartwright Act and Sherman Act,[3] some trade restraints are

27   ───────────────

     [3]    Due to parallels between the Cartwright Act and Sherman Act, courts may look to cases
28   discussing the Sherman Act when analyzing Cartwright Act violations.  *Marin Cty. Bd. of*
     *Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1976); *Nova Designs, Inc. v. Scuba Retailers*

                                                    6

1    *per se* unlawful, while other trade restraints are analyzed under the rule of reason.  *Ohio v. Am.*

2    *Express Co.*, 138 S. Ct. 2274, 2283–84 (2018); *In re Cipro Cases I & II*, 61 Cal. 4th at 146.  Over

3    time, courts have identified certain types of conduct that should be analyzed as a *per se* restraint

4    versus those analyzed under the rule of reason.  *See In re Musical Instruments & Equip. Antitrust*

5    *Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).

6          Defendant argues Plaintiff cannot assert *per se* claims because the rule of reason is the law

7    of the case.  (ECF No. 140 at 6.)  In doing so, Defendant points to the Court's previous order on

8    Defendant's motion for judgment on the pleadings, wherein the Court "f[ound] that the rule of

9    reason applies to this type of alleged restriction."  (ECF No. 65 at 8.)  In opposition, Plaintiff

10   contends the Court's order does not foreclose application of a *per se* analysis because the prior

11   order pertained to a challenge on the pleadings and Plaintiff has since obtained evidence in

12   discovery supporting its *per se* theory.  (ECF No. 123 at 9.)

13         Despite Plaintiff's arguments, the law of the case doctrine applies to issues decided on a

14   motion for judgment on the pleadings, just as it would any other motion.  *See, e.g.*, *Munoz v. PHH*

15   *Corp.*, No. 1:08-cv-0759-AWI-BAM, 2013 WL 1278509, at *5 (E.D. Cal. Mar. 26, 2013).  Here,

16   Plaintiff chose not to amend its FAC after the Court issued its ruling on the motion for judgment

17   on the pleadings.  As a result, the allegations facing Defendant on the present motion are the same

18   as those underlying the previous motion.  The law of the case may therefore be invoked.  *See*

19   *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018) (reversing

20   application of the law of the case because the plaintiff amended his complaint thereby presenting

21   new allegations not present when the district court made its previous order).

22         Regarding any exceptions to the law of the case, Plaintiff has not presented any arguments

23   of clear error, and there has been no intervening controlling authority or subsequent trial.  *See*

24   *Earl Old Pers.*, 312 F.3d at 1039.  Accordingly, because the same operative complaint and

25   allegations are before the Court as on the motion for judgment on the pleadings (ECF No. 54), the

26   law of the case requires the rule of reason analysis be applied to Plaintiff's Cartwright Act claim.

27   *Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000).  However, these Sherman Act authorities are
     instructive, rather than conclusive.  *In re Cipro Cases I & II*, 61 Cal. 4th at 142; *Knevelbaard*
28   *Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 985 (9th Cir. 2000).

1              *ii.*         *Regardless of the Law of the Case, the Rule of Reason Applies*

2          Even without the law of the case doctrine, the Court would apply the rule of reason to

3   Plaintiff's Cartwright Act claim.  A determination of whether an alleged restriction is horizontal

4   or vertical guides how the Court must analyze the restraint.  *See In re Cipro Cases I & II*, 61 Cal.

5   4th at 146.  Courts "determine the economic impact of the alleged conspiracy largely by

6   examining the economic relationship between the parties."  *Dimidowich v. Bell & Howell*, 803

7   F.2d 1473, 1480 (9th Cir. 1986).  In the case of a vertical restraint (when the relationship is

8   between entities at different levels of the same distribution chain), the rule of reason applies.  *Id.*

9   In the case of a horizontal restraint (when the relationship is between competitors at the same

10  level of distribution), the *per se* rule applies.  *Id.*

11         The Court previously found the rule of reason applies to this case because Plaintiff

12  "asserts facts consistent with an exclusive dealing arrangement resulting in vertical price restraint,

13  wherein two entities at different levels of production and distribution enter into an exclusive

14  arrangement in an effort to control the market's price for service."  (ECF No. 65 (citing *Pecover*

15  *v. Electronics Arts Inc.*, 633 F. Supp. 2d 976, 983 (N.D. Cal. 2009)).)  Plaintiff has not presented

16  evidence to convince this Court to now apply a *per se* analysis.

17         Plaintiff argues the instant case presents a hybrid restraint — as opposed to a purely

18  vertical restraint — because Defendant is a buyer of low-voltage installation services and also has

19  its own in-house installers.  (ECF No. 123 at 11.)  In other words, Plaintiff argues Defendant's

20  relationship is both vertical and horizontal.  Plaintiff relies on *Guild Wineries & Distilleries v. J.*

21  *Sosnick & Sons*, 102 Cal. App. 3d 627 (1980), to support this contention.  However, more recent

22  Ninth Circuit decisions suggest "the analysis in *Guild Wineries* is flawed."  *See Dimidowich*, 803

23  F.2d at 1482.  In *Dimidowich*, the Ninth Circuit explained, "Although a manufacturer's

24  relationship with its distributors has a horizontal aspect when it acts as a distributor itself, it

25  remains primarily a vertical relationship."  *Id.*  The Ninth Circuit held the rule of reason applies to

26  these types of hybrid restraints.  *Id.* at 1483.

27         Here, there is no indication Defendant was acting in its horizontal capacity.  Plaintiff's

28  president, Kurk Moody, states in a declaration that Defendant was involved with Plaintiff's

1    business activities during the realignment, but he says this involvement consisted of

2    recommendations and advice.  (ECF No. 124 ¶ 30.)  Plaintiff fails to provide evidence that

3    Defendant required contractors to trade employees or facilities, or that Defendant did anything

4    more to control Plaintiff's business activities.  While Defendant apparently did monitor the

5    contractors and the transfer of employees among the contractors, the mere monitoring of the

6    realignment plan's progress is insufficient to convert this relationship into something more than a

7    primarily vertical restraint.  *See Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 373 (2001)

8    (holding a manufacturer monitoring dealers' compliance with the manufacturer's policy without

9    forcing compliance does not violate the Cartwright Act).

10         Plaintiff alternatively argues the relationship between the contractors should be

11   characterized as a horizontal restraint due to the existence of a "hub-and-spoke" conspiracy

12   between the contractors.  However, the evidence does not support such a finding.  *See In re*

13   *Musical Instruments*, 798 F.3d at 1192.  A hub-and-spoke conspiracy requires: "(1) a hub, such as

14   a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into

15   vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal

16   agreements among the spokes."[4]  *Id.*  Put simply, Plaintiff's argument fails because there is no

17   evidence of a "rim" — that is, horizontal agreements among the contractors.  Instead, the record

18   before the Court reflects that each contractor was responsible for its own resource needs.  (ECF

19   No. 123-1 at ¶¶ 62–63, 66–68.)  Moreover, each contractor's employee was free to apply for

20   employment with other contractors, and each contractor retained independent authority to hire

21   anyone applying.[5]  (*Id.* at ¶¶ 66–67.)

22   _____

23   [4]    While other courts have identified a "rimless" hub-and-spoke conspiracy, this type of
     conspiracy is "a collection of purely vertical agreements" and analyzed under the rule of reason.

24   *In re Musical Instruments*, 798 F.3d at 1193 n.3.  Thus, the existence of a "rimless" hub-and-
     spoke conspiracy would still call for a rule of reason analysis of the possible vertical restraints.

25   [5]    Although Plaintiff disputes the fact that the contractors retained hiring authority with

26   respect to other contractors' employees (ECF No. 123-1 ¶ 67), the Court finds this dispute is not
     genuine.  Moreover, Plaintiff did not identify the portions of the record that support its

27   contention.  Therefore, Plaintiff failed to comply with Local Rule 260(b).  The Court need not
     "scour the record . . . and may rely on [Plaintiff] to identify with reasonable particularity the

28   evidence that precludes summary judgment."  *Simmons v. Navajo Cty.*, 609 F.3d 1011, 1017 (9th

1    Plaintiff argues a horizontal agreement among the contractors must be inferred from so-

2  called "plus factors."  (ECF No. 123 at 18.)  But this argument also fails.  "[P]lus factors are

3  economic actions and outcomes that are largely inconsistent with unilateral conduct but largely

4  consistent with explicitly coordinated action," and they can "raise[] a suggestion of preceding

5  agreement."  *In re Musical Instruments*, 798 F.3d at 1194.  Plaintiff identifies the following

6  purported plus factors: (1) a common motive to conspire; (2) members of a conspiracy acting

7  against their individual interests; (3) simultaneous conduct; and (4) a demonstrable parallel effect

8  on price.  (ECF No. 123 at 18.)

9    On review, Plaintiff's plus factors do not suggest horizontal agreement among the

10  contractors.  First, "common motive does not suggest an agreement."  *In re Musical Instruments*,

11  798 F.3d at 1194.  Second, while the contractors relinquished certain service areas and perhaps

12  other assets during the realignment, at most, these actions amount to decisions "to heed similar

13  demands made by a common, important customer," and such decisions "do not suggest

14  conspiracy or collusion."  *Id.*  Third, while the initial realignment was swiftly executed, this is

15  consistent with each contractor's actions under the vertical realignment plan with Defendant and

16  does not suggest any horizontal agreement.  *See id.* at 1196 ("Even assuming that the progressive

17  adoption of similar policies across an industry constitutes simultaneity, that fact does not reveal

18  anything more than similar reaction to similar pressures within an interdependent market, or

19  conscious parallelism.").  Fourth, Plaintiff argues a parallel effect on price is demonstrated by the

20  price-cut Defendant requested from its contractors.  But the record merely indicates Defendant

21  asked for lower prices from servicers.  This evidence, alone, does not establish Defendant coerced

22  a horizontal agreement.  *See id.* at 1197–98.

23    Lastly, Plaintiff appears to argue that a *per se* analysis is required because there is

24  evidence of price-fixing.  But Plaintiff fails to cite specific evidence or otherwise develop this

25  argument.  At most, the evidence demonstrates Defendant decided to pay installers based on a

26  similar price structure, which does not amount to price-fixing.  *See Walker v. USAA Cas. Ins. Co.*,

27  _____

28  Cir. 2010) (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)) (internal quotation
marks omitted).

1   474 F. Supp. 2d 1168, 1175 (E.D. Cal. 2007), *aff'd sub nom. Walker v. Geico Gen. Ins. Co.*, 558

2   F.3d 1025 (9th Cir. 2009) ("This is not price-fixing: it is just buying and selling with an

3   agreement on transaction prices.").

4        In sum, the evidence shows there were no horizontal agreements among the contractors.

5   To the extent Defendant's conduct can be labeled a hybrid restraint, such restraints are still

6   subject to the rule of reason.  Regardless, because the Court concludes the evidence presents at

7   most a possible vertical restraint, the rule of reason applies.  *In re Musical Instruments*, 798 F.3d

8   at 1191; *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 494–95 (2011).

9                         *iii.       Application of the Rule of Reason*

10       Defendant's rule of reason arguments are essentially unopposed.  Indeed, Plaintiff clarifies

11   many times throughout its briefing that it is only asserting *per se* violations of the Cartwright Act

12   which, as discussed above, fail.  Nonetheless, a court may not grant a motion for summary

13   judgment simply because it is not opposed.  Rather, the court must determine there are no

14   disputed issues of material fact.  *Cristobal v. Siegel*, 26 F.3d 1488, 1494–95, n.4 (9th Cir. 1994).

15       Under the rule of reason, the trier of fact weighs all circumstances of the case to determine

16   whether the agreement at issue is an unreasonable restraint on competition.  *Leegin Creative*

17   *Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).  Factors to be considered include

18   "specific information about the relevant business," "the restraint's history, nature, and effect,"

19   and whether the businesses involved have sufficient market power.  *Id.* at 885–86 (*quoting State*

20   *Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)).  "In its design and function the rule distinguishes

21   between restraints with anticompetitive effect that are harmful to the consumer and restraints

22   stimulating competition that are in the consumer's best interest."  *Id.*  Simply put, the trier of fact

23   must "measure[] whether the anticompetitive aspect of a vertical restraint outweighs its

24   procompetitive effects."  *Exxon Corp. v. Superior Ct.*, 51 Cal. App. 4th 1672 (1997).

25       Plaintiff fails to cite evidence to support even a reasonable inference that the realignment

26   plan was anticompetitive.  First, Plaintiff's allegation of price-fixing is not supported by the

27   evidence.  Plaintiff's evidence simply demonstrates Defendant asked for and implemented a price

28   cut in the amount Defendant paid to the contractors.  (ECF No. 124 ¶ 23; ECF No. 125-1 at 43.)

Plaintiff and Defendant are on different levels of the chain of distribution, making Plaintiff's allegation one of vertical price-fixing.  In a vertical price-fixing agreement, "the supplier establishes the price at which its distributors may sell the supplier's products."  *Kunert v. Mission Fin. Servs. Corp.*, 110 Cal. App. 4th 242, 263 (2003); *see also Knevelbaard*, 232 F.3d at 988.  Plaintiff fails to identify any evidence showing that the realignment plan led to fixed prices charged to a third party — a necessary component of vertical price-fixing.  *See Sausalito Pharmacy, Inc. v. Blue Shield of Cal.*, 544 F. Supp. 230, 234 (N.D. Cal. 1981), *aff'd*, 677 F.2d 47 (9th Cir. 1982).

Second, the evidence appears to demonstrate a nonexclusive dealing arrangement, which is not an anticompetitive restraint.  In an exclusive dealing arrangement, "a seller and a buyer agree that the buyer will buy only the seller's product or that the buyer will not buy the product of one of seller's competitors."  *UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 365 (2008), *as modified on denial of reh'g* (Jan. 13, 2009).  In the instant case, Plaintiff does not dispute that the terms of the PVAs are nonexclusive, but instead contends the PVAs are exclusive in practice.  (ECF No. 123-1 ¶ 32.)  However, Plaintiff fails to identify the specific portions of the record that support its contention.  *Simmons*, 609 F.3d at 1017 (quoting *Keenan*, 91 F.3d at 1279).  Further, Plaintiff does not dispute that after realignment, the contractors could still contract with any other buyer of installation services both inside and outside the contractors' assigned service areas.  (ECF No. 123-1 ¶ 60.)  Plaintiff even states, "the Contractors remained competitors throughout the realignment."  (ECF No. 123 at 10.)

If the realignment plan is termed as creating a territorial distributorship instead of a nonexclusive dealing arrangement, the evidence is still insufficient to find an anticompetitive restraint.  *See Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1196 (S.D. Cal. 2002) (quoting *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987)) (a manufacturer and distributor agreeing to establish an exclusive distributorship is insufficient on its own to be an antitrust violation).  While an exclusive territorial distributorship can constitute an antitrust violation if it is determined to be "anticompetitive, in purpose and effect, or both," (*Kolling v. Dow Jones & Co.*), 137 Cal. App. 3d 709, 719 (1982), the undisputed evidence does not support a

1    finding of anticompetitive behavior here.  As noted above, the PVA between Plaintiff and

2    Defendant was nonexclusive which reduces any anticompetitive effect.  Further, Defendant's

3    undisputed intentions for realignment were not anticompetitive.  (ECF No. 123-1 ¶¶ 55, 58.)

4            Absent anticompetitive restraint, the Cartwright Act does not restrict Defendant's ability

5    to choose whom it buys services from, even if that means not buying services from Plaintiff.  *See*

6    *Kolling*, 137 Cal. App. 3d at 718–19; *see also Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204

7    Cal. App. 4th 1, 20 (2012) ("the Cartwright Act is about . . . the protection of competition, not

8    competitors") (internal quotation marks omitted).  Because Plaintiff fails to put on evidence to

9    show the realignment plan was anticompetitive, Plaintiff's antitrust claim fails as a matter of law.

10   Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiff's

11   Cartwright Act claim.

12                    B.    Civil Conspiracy Claim

13           Defendant next moves for summary judgment on Plaintiff's civil conspiracy claim,

14   arguing that Defendant acted unilaterally and there is no evidence Defendant engaged in the

15   underlying unlawful activity.  (ECF No. 98 at 22.)  In opposition, Plaintiff argues Defendant

16   facilitated a horizontal conspiracy and thus became part of that conspiracy.  (ECF No. 123 at 14.)

17           "Standing alone, a conspiracy does no harm and engenders no tort liability.  It must be

18   activated by the commission of an actual tort."  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,

19   7 Cal. 4th 503, 511 (1994); *see also Sprewell v. Golden State Warriors*, 266 F.3d 979, 992 (9th

20   Cir. 2000), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).  Additionally,

21   civil conspiracy may be activated by violation of a statutory duty.  *See Rickley v. Goodfriend*, 212

22   Cal. App. 4th 1136, 1158 (2013).

23           Plaintiff's civil conspiracy claim arises from the same conduct alleged in the Cartwright

24   Act claim.  (ECF No. 42 at ¶¶ 57–60.)  Because the Court has found no evidence of an antitrust

25   violation, there is no tort or statutory violation to support Plaintiff's civil conspiracy claim.  *See*

26   *Mintz v. Mark Bartelstein & Assocs. Inc.*, 906 F. Supp. 2d 1017, 1042 (C.D. Cal. 2012) (granting

27   summary judgment for counterdefendants on conspiracy claim because "there [wa]s no evidence

28   of any predicate wrongful acts").  Accordingly, the Court grants Defendant's motion for summary

                                                    13

1  judgment as to Plaintiff's civil conspiracy claim.

2              C.      Cal. Bus. & Prof. Code § 17200 ("UCL claim")

3       Lastly, Defendant moves for summary judgment on Plaintiff's UCL claim because it is

4  derivative of the Cartwright Act claim.  (ECF No. 98 at 22–23.)  The UCL's "unlawful" prong

5  "borrows violations of other laws and treats them as unlawful practices that the [UCL] makes

6  independently actionable."  *Cel-Tech Comm's, Inc. v. L.A. Cellular Telephone Co.*, 20 Cal. 4th

7  163, 180 (1999) (internal quotation marks omitted).  Here, Plaintiff predicates its UCL claim on

8  Defendant's alleged violation of the Cartwright Act.  (ECF No. 123 at 18.)  Because the Court has

9  granted summary judgment for Defendant on the Cartwright Act claim, Plaintiff's UCL claim

10  must also fail.  *See also City of San Jose v. Office of the Com'r of Baseball*, 776 F.3d 686, 691

11  (9th Cir. 2015) (citation omitted).  Accordingly, the Court grants summary judgment as to

12  Plaintiff's UCL claim.

13      **IV.    CONCLUSION**

14      For the foregoing reasons, the Court hereby GRANTS Defendant's Motion for Summary

15  Judgment.  (ECF No. 97.)  Plaintiff's remaining claims are hereby DISMISSED.

16   IT IS SO ORDERED:

17

18   DATED:  November 16, 2020

19

20                                              Troy L. Nunley
21                                              United States District Judge

22

23

24

25

26

27

28

14